1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     United States of America,      )   File No. 18-CR-178
4                                   )             (JNE/DTS)
            Plaintiff,              )
5                                   )
     v.                             )   Minneapolis, Minnesota
6                                   )   November 29, 2018
     Timothy Joseph Jensen,         )   2:00 p.m.
7                                   )
            Defendant.              )
8    ------------------------------------------------------------

9            BEFORE THE HONORABLE DAVID T. SCHULTZ
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
10                      **(MOTION HEARING)**

11   **APPEARANCES**
      **For the Plaintiff:**        **U.S. ATTORNEY'S OFFICE**
12                                  **CAROL KAYSER, AUSA**
                                    300 S. 4th St., #600
13                                  Minneapolis, Minnesota 55415

14    **For the Defendant:**        **OFFICE OF THE FEDERAL DEFENDER**
                                    **DOUGLAS MICKO, ESQ.**
15                                  **REYNALDO ALIGADA, JR., ESQ.**
                                    300 S. 4th St., #175
16                                  Minneapolis, Minnesota 55415

17   Court Reporter:               DEBRA K. BEAUVAIS, RPR-CRR
                                   300 S. 4th St., #1005
18                                 Minneapolis, Minnesota 55415

19

20

21

22       Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1  THE LAW CLERK:  All rise.  United States District

2  Court for the District of Minnesota is now in session, the

3  Honorable David T. Schultz presiding.

4  THE COURT:  Good afternoon, everyone.  Have a

5  seat, please.

6  All right.  Good afternoon.  We're on the record

7  in the matter of the United States v. Timothy Joseph Jensen,

8  Criminal No. 18-178.

9  Will counsel for the government note your

10  appearance for the record, please.

11  MS. KAYSER:  Good afternoon, Your Honor.  Carol

12  Kayser for the United States of America.  And with me at

13  counsel table is FBI Special Agent Glenn Moule and Detective

14  Tom Rother of the City of Mankato Police Department.

15  THE COURT:  Very well.  Good afternoon,

16  Ms. Kayser.

17  For the defendant.

18  MR. MICKO:  Good afternoon, Your Honor.  Doug

19  Micko and Reggie Aligada, along with Mr. Jensen who is

20  present with us at counsel table.

21  THE COURT:  Welcome.

22  I assume as to Docket Nos. 27 through 32, the

23  non-dispositive motions, is there anything further to argue

1    on those motions?

2            MR. MICKO:  No, Your Honor.

3            THE COURT:  All right.  You agree, Ms. Kayser?

4            MS. KAYSER:  Yes, sir.

5            THE COURT:  All right.  We'll get the order out on

6    those maybe today, maybe tomorrow.

7            All right.  So then we have the dispositive

8    motion, Docket No. 33.  I don't think we have witnesses on

9    that.  Is that correct?

10           MR. MICKO:  That's right, Your Honor, no

11   witnesses.

12           THE COURT:  All right.  Is the defendant

13   submitting any further briefing on that issue?

14           MR. MICKO:  We would like to, Your Honor.  I'm

15   happy to do that at the same time as follow-up briefing on

16   the motion that we'll have testimony for today.

17           THE COURT:  Sure.  That makes sense.

18           Let me sort of direct your attention on one thing

19   on that matter.  I guess in my mind the big question is with

20   respect to the search warrant, are you making arguments that

21   are somehow different from what was argued before Magistrate

22   Judge Noel and then decided by Chief Judge Tunheim and then,

23   I believe, decided by the Eighth Circuit?

24           MR. MICKO:  I don't think we're going to be making

25   any different arguments, Your Honor.

1          THE COURT:  Okay.  Very well.  And then,

2     obviously, the government will have response briefing on

3     both of those, warrants and the statements.

4          So that brings us to Docket No. 34, which is the

5     motion to suppress statements.  Correct?

6          MR. MICKO:  Yes, Your Honor.  And before we get to

7     testimony on that, there's one other issue with statements

8     that I think the parties would want to put on the record.

9          There was a statement that was not included within

10    our motion to suppress, a statement given on March 8th of

11    2018.  I understand from the government they are not

12    intending to use that in their case-in-chief and, therefore,

13    we haven't move to suppress that statement.

14         THE COURT:  Okay.  All right.  Is that correct,

15    Ms. Kayser?

16         MS. KAYSER:  Yes, Your Honor.

17         THE COURT:  Okay.  All right.  Then with that, I

18    believe the government has witnesses that it intends to call

19    on this motion.  Correct?

20         MS. KAYSER:  I do, Your Honor.  But I just wanted

21    to go back to Docket No. 33, which was the motion to

22    suppress the search warrants.

23         THE COURT:  Yes.

24         MS. KAYSER:  The government would just ask that

25    the defense be required to articulate what the specific

1    objections are before the government is required to respond,

2    because I can't respond if I don't know what the arguments

3    are.

4           THE COURT:  I assume you're going to make it clear

5    what you're arguing as to why the warrant is invalid?

6           MR. MICKO:  I hope to.

7           THE COURT:  All right.  Let me make sure,

8    Ms. Kayser, we're meeting your concern, whatever it is.  Is

9    it that you -- well, why don't you articulate it.

10          MS. KAYSER:  Well, sometimes I have had in the

11   past where defense counsel just says we're going to ask the

12   court to do a four corners analysis and that's it.  So I'm

13   asking that whatever objections there are that they be

14   articulated.

15          THE COURT:  Right.  Well, I would ask the same

16   thing.  I take it that what you are going to -- you're not

17   just going to say it's the four corners.  You're going to

18   talk about whether it was beyond the authority of the

19   magistrate judge who issued, et cetera?

20          MR. MICKO:  Yeah.  I think it's typically been my

21   practice when asking even for a four corners analysis to

22   articulate why under the four corners of the warrant it

23   might not be valid.

24          THE COURT:  Okay.  Well, Ms. Kayser, when you see

25   their briefing if you find it deficient or somehow not

1     sufficiently informative, I'm sure you will make that known.

2               I will tell you, obviously, if I don't know what

3     you're arguing and you're just saying four corners, it's not

4     going to help your case.

5               MR. MICKO:  Understood, Your Honor.

6               THE COURT:  Okay.  Fair enough?

7               MS. KAYSER:  Yes, Your Honor.

8               THE COURT:  Okay.  All right.  Are you ready to

9     proceed with the statements then?

10              MS. KAYSER:  Yes, Your Honor.

11              THE COURT:  Okay.  Who is your first witness?

12              MS. KAYSER:  Your Honor, the government calls

13    Special Agent Glenn Moule to the stand.

14              THE COURT:  All right.  Agent Moule, if you would

15    come on up.  Raise your right hand, please.

16              (Witness administered oath by the Court.)

17              THE COURT:  Very well.  Be seated.

18              State your name for the record, please, and spell

19    your last name for the court reporter.

20              THE WITNESS:  Glenn Moule, M-O-U-L-E.

21              THE COURT:  Go ahead.

22              MS. KAYSER:  Thank you, Your Honor.

23              At this time the government would tender, with

24    agreement of the parties, Government's Exhibits 1, 2, 3, and

25    4.  Government Exhibit 1 is the warrant from the Eastern

1   District of Virginia.  Government Exhibit 2 are the search

2   warrant materials from the District of Minnesota.

3   Government Exhibit 3 is the audio recording of the October

4   8th, 2015 interview conducted by Special Agent Moule.  And

5   Government Exhibit 4 is the audio and visual recording of

6   the August 10th, 2018 interview of the defendant.

7              THE COURT:  Any objection, Mr. Micko?

8              MR. MICKO:  No, Your Honor.

9              THE COURT:  Very well.  Those exhibits, Government

10   Exhibits 1 through 4 inclusive, are admitted.

11              MS. KAYSER:  Thank you, Your Honor.

12

13   **GLENN MOULE**

14                    **DIRECT EXAMINATION**

15   **BY MS. KAYSER:**

16   Q.  Agent Moule, by whom are you employed, sir?

17   A.  By the FBI.

18   Q.  Is that also known as the Federal Bureau of

19   Investigation?

20   A.  It is.

21   Q.  What is your title?

22   A.  I'm a special agent.

23   Q.  How long have you been a special agent with the FBI?

24   A.  A little over eight years now.

25   Q.  What are your duties and responsibilities as a special

1    agent?

2    A.  I investigate various violations of federal law to

3    include child exploitation, child pornography cases.

4    Q.  Were you involved in the investigation of the defendant,

5    Timothy Joseph Jensen?

6    A.  I was.

7    Q.  And are you the case agent?

8    A.  I am.

9    Q.  When did you first meet Mr. Jensen?

10   A.  The day I executed a search warrant at his house.  I

11   believe it was October 8th of 2015.

12   Q.  Where is his house located?

13   A.  In Mankato, Minnesota.

14   Q.  And is it an apartment or a house?

15   A.  It's a house.

16   Q.  And is that in a neighborhood, a residential area?

17   A.  Yes.

18   Q.  And how was it that you developed your case regarding

19   Mr. Jensen?

20   A.  I received a lead from FBI headquarters in Washington

21   regarding a child pornography investigation that had been

22   run out of our Washington field office, and as some

23   information had been developed in their case that related to

24   Mr. Jensen, they passed that along to me.

25   Q.  Was that operation known as Operation Playpen?

1    A.  It was.

2    Q.  And did the Eastern District of Virginia execute search

3    warrants there?

4    A.  Yes.

5    Q.  You have before you Government Exhibit 1.  Do you see

6    that?

7    A.  I do.

8    Q.  Have you seen Government Exhibit 1 before today?

9    A.  Yes.

10   Q.  What is Government Exhibit 1?

11   A.  It is a search warrant issued in the Eastern District of

12   Virginia for a set of computers related to the Torrent

13   network.

14   Q.  Does Government Exhibit 1 also include the application

15   submitted by the FBI agent in the Eastern District of

16   Virginia in order to obtain the search warrant?

17   A.  Yes.

18   Q.  Now, you indicated that certain information was relayed

19   to you about Mr. Jensen; is that correct?

20   A.  Correct.

21   Q.  And did you conduct your own investigation?

22   A.  I did.

23   Q.  And can you tell us, did you execute a search warrant at

24   Mr. Jensen's house on October 8th, 2015?

25   A.  I did.

1    Q.  How did you obtain that search warrant?

2    A.  I applied for a search warrant in the District of

3    Minnesota.

4    Q.  And was that Judge Mayeron?

5    A.  It was.

6    Q.  You have before you Government Exhibit 2.  What is

7    Government Exhibit 2?

8    A.  It is a copy of the search warrant and application for

9    search warrant for the warrant that I applied for in the

10   District of Minnesota with Judge Mayeron.

11   Q.  Do you know Judge Mayeron personally?

12   A.  No.

13   Q.  At the time you executed the search warrant in this case

14   in October of 2015, did you have any doubts about the

15   legality of that search warrant?

16   A.  No.

17   Q.  Did you believe it was a valid search warrant?

18   A.  I did.

19   Q.  Can you tell the Court how it was that you went about

20   executing the search warrant on October 8th, 2015.

21   A.  It was approximately 8:00 in the morning that day.

22   Myself, several other FBI agents, and personnel from the

23   Mankato Police Department knocked and announced on the front

24   door of Mr. Jensen's home.  I announced, "FBI search

25   warrant."  One of the agents that was standing at the corner

1    of the home noticed somebody had looked out the windows

2    through the blinds.  At that time, that agent announced,

3    "FBI, come to the door."  So we knew somebody was in the

4    house.  Approximately 45 to 60 seconds went by and still

5    nobody showed up at the front door.  At that point, we

6    breached the door.  When the door came open, Mr. Jensen was

7    standing in the entranceway at that moment and we called him

8    outside.

9    Q.  When you say "called him outside," what do you mean?

10   A.  Either myself or another agent would have said something

11   to the effect of FBI, hands up, come outside, come outside,

12   come to the door, we have a search warrant.  And I think I

13   ended up outside with him talking to him while the rest of

14   the agents cleared the home.

15   Q.  And when you say "cleared the home," what do you mean?

16   A.  Safety sweep of the property to make sure there's no

17   danger areas in there, nobody else present.

18   Q.  Was anyone else in the home?

19   A.  No.  Mr. Jensen was in there by himself.

20   Q.  And when you say you "breached the door," what does that

21   mean?

22   A.  Forcibly knocked it open with a tool.

23   Q.  How often do you do that?

24   A.  Rarely, actually.

25   Q.  Now, after you had Mr. Jensen come outside, what

1    happened?

2    A.  I explained to him that I was with the FBI, that a

3    search warrant had been issued for his house, and provided

4    him with a copy of the search warrant.  And I let him know

5    what the rest of the people on the property were doing, that

6    they were doing a security sweep to check -- make sure there

7    was nothing in there that would hurt us and see if there was

8    anybody else inside.

9    Q.  Did you tell him the nature of your investigation?

10   A.  I did.

11   Q.  What did you tell him?

12   A.  I told him that a search warrant had been issued related

13   to evidence related to child pornography; that we were

14   there, in essence, to look for evidence of child

15   pornography.

16   Q.  What, if any, response did Mr. Jensen have?

17   A.  At that moment, after I told him what the purpose of the

18   search warrant was, he became pretty emotional.  He started

19   to breathe heavily, almost started to cry.  At that point,

20   he said he needed to make a phone call, that he wanted to

21   have his mom with him.

22   Q.  What did you respond?  Or how did you respond?

23   A.  I asked him if he had a landline and he said, "No."  And

24   he attempted to pick up his cell phone, and I told him that

25   his cell phone was going to be collected as evidence so he

1    wasn't going to be able to access it at that time to make

2    that call.

3    Q.  Did the search warrant, in fact, authorize the seizure

4    of Mr. Jensen's electronics?

5    A.  It did.

6    Q.  So you said to Mr. Jensen that he could not use his cell

7    phone; is that correct?

8    A.  Correct.

9    Q.  Where were you at this time?

10   A.  At that point, we would have been inside his home, like

11   in the living room area.

12   Q.  And you went back inside the home?

13   A.  Yes.

14   Q.  What was the purpose of going back inside the home?

15   A.  He actually walked back inside the home to initiate that

16   phone call.  We had been outside at that time.  And when I

17   told him the nature of the search warrant related to child

18   pornography, then he turned around and said, "I need to make

19   a phone call" and walked back in.

20   Q.  No one stopped him; is that right?

21   A.  That's right.

22   Q.  He walked inside and you told him he couldn't use his

23   cell phone; is that right?

24   A.  Right.

25   Q.  What happened next?

1    A.  He said, "Well, then let's talk outside.  I want to

2    smoke."  So we went back outside just off the side door by

3    his driveway.

4    Q.  So it was Mr. Jensen's idea to go outside?

5    A.  Yes.

6    Q.  And you allowed him to go outside?

7    A.  Yes.

8    Q.  Did anybody else go with you outside?

9    A.  No.  We were out there by ourselves for the most part.

10   During the time we were out there, there may have been an

11   agent coming back and forth relaying some information to me,

12   but it was the two of us for the most part.

13   Q.  At any time during your arrival -- or during your stay

14   at Mr. Jensen's house on October 8th, 2015, did you handcuff

15   Mr. Jensen?

16   A.  No.

17   Q.  So you indicated that you went outside so that

18   Mr. Jensen could smoke; is that right?

19   A.  Correct.

20   Q.  What happened once you and Mr. Jensen were outside?

21   A.  I again explained to him that we had a search warrant,

22   and I told him that I wanted to have the opportunity to

23   explain to him sort of the underlying causes of it and an

24   opportunity to talk with him.

25   Q.  Okay.  And did you tell him if he was under arrest?

1    A.  I told him he was not under arrest, that he didn't have

2    to talk to me, and he was free to leave if he wanted to --

3    if he chose to.

4    Q.  Did you have any plans to arrest him that day?

5    A.  No.

6    Q.  And did you ask him if you could talk to him?

7    A.  I did.

8    Q.  And did you record your request to talk to him?

9    A.  My recorder was running.  I'm not sure if my initial

10   request to talk to him would have been on the recorder at

11   that time.  I hadn't activated it until we were actually

12   outside.

13   Q.  When you reiterated your request to talk to him, was

14   your recorder activated?

15   A.  Yes.

16   Q.  And so can you hear your conversation with Mr. Jensen on

17   that recording?

18   A.  Yes.

19   Q.  You have before you Government Exhibit 3.  Do you see

20   that?

21   A.  I do.

22   Q.  What is Government Exhibit 3?

23   A.  It is a disk containing the audio interview of myself

24   and Mr. Jensen.

25   Q.  Is it true and correct to the best of your knowledge and

1    belief?

2    A.  It is.

3    Q.  So you indicated to Mr. Jensen that you wanted to chat

4    with him; is that correct?

5    A.  Correct.

6    Q.  What did he tell you?

7    A.  That he wanted to chat outside so he could smoke.

8    Q.  And he used, in fact, the word "chat"; is that correct?

9    A.  That's right.

10   Q.  Now, did you threaten Mr. Jensen to get him to chat with

11   you?

12   A.  No.

13   Q.  Did you promise him anything in exchange for his

14   agreement to chat with you?

15   A.  No.

16   Q.  And was Mr. Jensen free to leave?

17   A.  He was.

18   Q.  Now, did Mr. Jensen appear to you to be oriented to time

19   and place?

20   A.  Yes.

21   Q.  Did he appear to you to be oriented to understand your

22   statements and questions?

23   A.  Yes.

24   Q.  Did you have your gun out at any time while you were

25   talking to Mr. Jensen?

1    A.  No.

2    Q.  Where was your gun?

3    A.  In the holster.

4    Q.  Now, did Mr. Jensen volunteer information to you during

5    your chat?

6    A.  He did.

7    Q.  How would you describe the nature or circumstances of

8    your conversation with Mr. Jensen?

9    A.  Pretty low key and calm.

10   Q.  Can you hear that in the recording?

11   A.  Yes.

12   Q.  Did you raise your voice at all at any time during your

13   chat with Mr. Jensen?

14   A.  No.

15   Q.  What was Mr. Jensen's demeanor?

16   A.  For the most part, pretty calm.  I mean, he initially

17   became a little excited after I told him the nature of the

18   search warrant, but after that he calmed down and seemed to

19   be fine talking with me.

20   Q.  Did he, in fact, laugh during your conversation with

21   him?

22   A.  He did.

23   Q.  Can you hear that on the recording?

24   A.  Yes.

25   Q.  Did you at any time reiterate during your chat that

1   Mr. Jensen was not under arrest?

2   A.  Yes.

3   Q.  Now, during your chat with Mr. Jensen did he ask to go

4   to his truck?

5   A.  He did.

6   Q.  What for?

7   A.  He wanted to get something to drink.  I believe he

8   retrieved a bottle of Mountain Dew.

9   Q.  So he did, in fact, go to his truck to retrieve

10  something?

11  A.  Yes.

12  Q.  Did you search the truck beforehand?

13  A.  Before he grabbed the Mountain Dew, no.  I would have

14  walked up to the truck with him.  I believe I asked him if

15  there was weapons or anything dangerous in there.  And I

16  watched him while he grabbed the bottle.

17  Q.  Why did you accompany him to the truck?

18  A.  For my own safety, just to make sure he wasn't going to

19  access a weapon in there.

20  Q.  Now, during your chat with Mr. Jensen, did he confess to

21  you that he had searched for child pornography online?

22  A.  Yes.

23  Q.  Did he indicate to you how long he had been doing this?

24  A.  Yes.  He stated the first time he had viewed it online

25  was either 1995 or 1996.

1    Q.  Did he indicate whether he recognized that there was

2    criminal liability for this?

3    A.  Yes.

4    Q.  What did he tell you?

5    A.  That he shouldn't have gotten involved with this,

6    something to that effect, and he had an idea that this day

7    would come.

8    Q.  Did he at all talk about how he felt when he realized

9    the FBI was at his door?

10   A.  Yes.  He said he was scared, and he also wet himself.

11   Q.  Approximately how long did your chat with Mr. Jensen

12   last?

13   A.  About an hour and a half.

14   Q.  At the conclusion of the chat, did you arrest

15   Mr. Jensen?

16   A.  No.

17   Q.  Did you advise him that he was free to go?

18   A.  Yes.

19   Q.  Did you do that more than once?

20   A.  Yes.

21   Q.  Did Mr. Jensen have any questions that he wanted to ask

22   of you?

23   A.  Yes.  I believe he asked me what was going to happen to

24   him.

25   Q.  What did you tell him?

1    A.  I told him that he wasn't going to be taken into

2    custody, that we -- like I told him before, it was just a

3    search, that he was -- I was going to go on my way and he

4    was free to go on his way, and that I was going to discuss

5    the matter with federal prosecutors.

6    Q.  Now, if Mr. Jensen had wanted to leave at any time

7    during your chat or during the execution of the search

8    warrant, would anyone have stopped him?

9    A.  No.

10          MS. KAYSER:  I have no further questions.  Thank

11   you.

12

13                    **CROSS-EXAMINATION**

14   **BY MR. MICKO:**

15   Q.  Special Agent Moule, following up on that last question,

16   you can't -- as you sit here today, you can't say what any

17   of the other agents would have done if Mr. Jensen had tried

18   to leave, can you?

19   A.  No.  Myself personally, I wouldn't have stopped him.

20   Being agents are all trained the same way I am, I am

21   assuming they wouldn't either.

22   Q.  Some of those agents were FBI agents on scene, right?

23   A.  All the agents on scene were FBI agents.  There were two

24   officers from the Mankato Public Safety there.

25   Q.  Altogether how many officers were present during the

1    execution of the warrant?

2    A.   Initially two, I think; one uniform and one detective

3    possibly.  And the uniform probably would have left as soon

4    as the scene was clear.  I think one detective would have

5    remained on scene.

6    Q.   Again, how many FBI agents?

7    A.   Four or five maybe.

8    Q.   So altogether -- other than the uniformed Mankato

9    officers, the FBI agents, were there any other

10   law-enforcement personnel at the scene?

11   A.   No.

12   Q.   How many vehicles were present at the scene?

13   A.   None right in the immediate area.  We would have parked

14   on the side street and walked in a little bit.  But everyone

15   would have had their own vehicle.  So probably six or seven.

16   Q.   And you had scouted the area before executing the

17   warrant, right?

18   A.   Correct.

19   Q.   Part of your protocol would be to ensure that there was

20   no way for somebody who might be in the house to escape,

21   right?

22   A.   No.  We would have identified areas where somebody could

23   possibly leave and known where those were.

24   Q.   When you and your team approached for the warrant, did

25   everyone come up the driveway the same way or did people

1    splay out throughout the area?

2    A.  No, there would have been people covering all sides of

3    the house, people in front as well as the back entrance.

4    Q.  And the warrant that I think you have in front of you as

5    Exhibit B (sic), it ordered a search of any vehicles on the

6    premises as well, right?

7    A.  Correct.

8    Q.  That would include Mr. Jensen's vehicle?

9    A.  Yes.

10   Q.  And during your recorded conversation with Mr. Jensen,

11   do you remember telling him that you needed your team to

12   secure the scene?

13   A.  Yeah.

14   Q.  Before he would be able to leave; is that right?

15   A.  That if he wanted to leave in his vehicle -- we were

16   going to search his vehicle before he would be allowed to

17   leave if he wanted to leave in his vehicle.

18   Q.  And his vehicle wasn't searched at any time during your

19   conversation with him, right?

20   A.  It may have.  It wasn't by me personally because I was

21   talking to him.  Other agents on scene may have searched it

22   during the time that I was talking with him.

23   Q.  You were standing outside the whole time, right?

24   A.  Correct.

25   Q.  Looking out to the vehicle?

1    A.  We were near the vehicle, but I wouldn't have had my

2    eyes on it the whole time.

3    Q.  But it was in your line of sight?

4    A.  Yeah.

5    Q.  I believe you testified that when you started to execute

6    the warrant that there was a knock and no answer at the

7    door.  Right?

8    A.  Correct.

9    Q.  And then one of your agents saw some type of movement

10   inside, right?

11   A.  Yes.

12   Q.  And you have executed -- how many warrants do you think

13   you have executed in your career?

14   A.  I'm not sure.  Dozens.

15   Q.  It's a dangerous situation when there seems like there's

16   somebody who is in the house that's not answering, right?

17   A.  Can be.

18   Q.  And your team responded as if this was a dangerous

19   situation, didn't they?

20   A.  Yes.

21   Q.  They pulled their guns out, right?

22   A.  We would have had our guns out, yes.

23   Q.  Guns were drawn on Mr. Jensen when he was breached,

24   right?

25   A.  Yes.

1   Q.  How many officers drew their guns on Mr. Jensen?

2   A.  Three to four.

3   Q.  And that was the time where there was -- you're familiar

4   with the continuum of force, right?

5   A.  Yes.

6   Q.  Part of the continuum of force isn't just pulling guns

7   out but also using a loud verbal command, right?

8   A.  Correct.

9   Q.  Like FBI, hands up, loud, right?

10  A.  Yes.

11  Q.  And that's what happened when these guns were pulled on

12  Mr. Jensen?

13  A.  Yes.

14  Q.  And did Mr. Jensen appear to be compliant?

15  A.  Yes.

16  Q.  He didn't try to run away?

17  A.  No.

18  Q.  You said there were vehicles parked throughout the area,

19  but none in the driveway?

20  A.  Not at first.  If any vehicles came up in the driveway,

21  it would have been after the scene was secure and somebody

22  may have moved closer to bring in some search supplies.

23  Q.  Do you remember if any of those vehicles parked in a way

24  that blocked in that Tahoe?

25  A.  No.

```
 1    Q.  You don't remember?

 2    A.  I don't believe that there were.

 3    Q.  When Mr. Jensen answered -- the search happened about

 4    8:00 in the morning, right?

 5    A.  Yes.

 6    Q.  When Mr. Jensen answered the door, what was he wearing?

 7    A.  I don't immediately recall.  It would have been like a

 8    T-shirt and pants probably.

 9    Q.  T-shirt and underwear?  Does that sound familiar?

10    A.  Yeah, that might have been it.

11    Q.  No socks?  No shoes?

12    A.  Not if he was in his underwear, no.

13    Q.  He was ordered outside, right?

14    A.  Yes.

15    Q.  In his underwear?

16    A.  Yes.

17    Q.  He complied with that order?

18    A.  Yes.

19    Q.  You said that at some point you started recording with

20    your device, right?

21    A.  Correct.

22    Q.  And I believe you said your recollection of the series

23    of events was that Mr. Jensen was ordered outside, tried to

24    come back inside to use his cell phone, and then came back

25    outside to talk with you.  Right?
```

1    A.  No, that wasn't the immediate sequence of events.  What

2    would have happened, we would have called him out.  If he

3    would have been wearing just a pair of underwear, once the

4    scene was secure, we would have brought him back in, gotten

5    some pants and clothes on him, and we would have gone

6    outside to the driveway to talk.  And that's when my

7    recorder would have been started, when we initially came

8    outside.  And then when he went back inside, that was after

9    my recorder was running and I told him, hey, this is what

10   the search warrant is for.

11   Q.  I see.  It sounds on the recording like that part where

12   you indicated Mr. Jensen gets emotional is on the recording,

13   right?

14   A.  It is.  Yes.

15   Q.  Okay.  So that was maybe his second time coming back

16   inside or trying to come back inside, right?

17   A.  That would have been the second time in there.  The

18   first time he would have gone back in it would have been to

19   get some pants on.

20   Q.  Now let me ask you a couple of questions about that

21   second time.

22           To orient you, I think this all happens in about

23   the first five minutes of the recording.  Is that about

24   right?

25   A.  Yeah, if that.

1    Q.  And you indicate to Mr. Jensen that he is being

2    investigated for child pornography offenses, right?

3    A.  Yes.

4    Q.  And I think the word you used was he became "emotional."

5    Right?

6    A.  Yes.

7    Q.  And he says on the recording "Someone needs to be here."

8    Do you remember that?

9    A.  Yeah.  I think he said, "I need someone here.  I want my

10   mom here.  I want to call my mom."

11   Q.  "I need to make a call," right?

12            And at that time, what did you do to honor his

13   request?

14   A.  Well, I had asked him if he had a landline so he could

15   make a phone call to his mom or whoever he wanted to.

16   Q.  And he didn't, right?

17   A.  No, and he didn't.  So then he turned around and said,

18   "Okay, let's talk outside then.  I want to smoke."  So we

19   went outside.

20   Q.  Do you remember telling him that he would be allowed to

21   use -- or you could make a call for him after the search was

22   completed?

23   A.  Yeah.  Near the end of the interview I asked him -- I

24   think I might have asked him, hey, do you have any questions

25   for me, is there anybody I can call for you?  Do you want me

1    to call your mom or anybody?  And he said, "No."

2    Q.  Right within those first five minutes when he asked

3    you -- told you that he needed somebody there and you said

4    he wouldn't be able to use his phone, you didn't allow him

5    to use your phone, right?

6    A.  No.

7    Q.  Didn't offer to make a call for him immediately, right?

8    A.  No, not immediately.

9    Q.  And, in fact, at that time you told him that you could

10   contact somebody for him once the search was complete,

11   right?

12   A.  I don't know if I told him at that point I can contact

13   somebody after we're done here.  But that would have all

14   been within the same, you know, initial line of statements

15   about how it was a search, that he wasn't under arrest, that

16   he didn't need to talk to me.

17   Q.  When you told him he wasn't under arrest, you also told

18   him that you needed to secure the scene, right?

19   A.  Yes.

20   Q.  Part of the scene would include the car, right?

21   A.  Yeah, part of the overall scene.  Sure.

22   Q.  Do you remember when Mr. Jensen went back inside to put

23   pants on whether he put shoes and socks on as well?

24   A.  I don't specifically, but I imagine the fact that it was

25   October 8th he would have.

1    Q.  I think it was a relatively temperate day on October

2    8th.  Maybe you don't remember.

3    A.  I don't.

4    Q.  When officers drew their guns on Mr. Jensen and ordered

5    him to put his hands up, you were included within that group

6    of officers, right?

7    A.  That's right.

8    Q.  So you had your gun pointed at Mr. Jensen as well,

9    right?

10   A.  Yes.

11   Q.  And then at some point you must have reholstered it?

12   A.  Yes.

13   Q.  Do you keep your gun on sidearm or how do you hold your

14   gun?

15   A.  Yeah, it would have been a holster on my side.

16   Q.  And was it obscured by anything?

17   A.  At the initial entry, no.

18   Q.  What about when you were talking to Mr. Jensen?  Was it

19   still visible on your side?

20   A.  It would have been either visible in my holster or my

21   shirt may have been covering it.  I don't recall.

22   Q.  The government asked you a couple of questions about the

23   warrant.  You are familiar with that warrant, right?

24   A.  I'm familiar with the fact that it was issued in the

25   Eastern District of Virginia, but I wasn't the one who

1    applied for the warrant.

2    Q.  No, I understand you didn't apply for it.  But you

3    reviewed the warrant application, right?

4    A.  Yeah, at one point in time.

5    Q.  And you understand -- it's fair to say that that warrant

6    was somewhat provocative, right?

7    A.  At the time I did not know that, no.

8    Q.  You have been an FBI agent for 11 years, right?

9    A.  A little over eight years.

10   Q.  Sorry, I got that wrong.

11          Do you understand -- how many warrants have you

12   applied for do you expect?

13   A.  I'm not sure.  More than 20 I imagine.

14   Q.  Have you ever applied for a warrant to search anything

15   outside of a state?

16   A.  Yes.

17   Q.  Where?

18   A.  Computer servers in California.

19   Q.  Okay.  And that warrant was issued in Minnesota?

20   A.  Correct.

21   Q.  When did that happen?

22   A.  It happens on a pretty frequent basis actually, anytime

23   there is like a Google account, for instance, like an e-mail

24   account.  Their headquarters are located in California.

25   Q.  Now, is that by warrant or is that by subpoena?

1    A.  No, search warrant.

2    Q.  In this warrant there was an authorization -- in this

3    Virginia warrant there was an authorization to actually add

4    malware to people's computers, wasn't there?

5    A.  I'm not sure of the specifics, if it mentioned there was

6    going to be malware installed or not.

7    Q.  Have you ever sought authorization to do that type of

8    thing?

9    A.  No.

10   Q.  You said that there were cars that may have pulled up

11   some time later during the search.  How long did the search

12   take in all?

13   A.  An hour and 45 minutes to two hours.

14   Q.  And your interview of Mr. Jensen took about that same

15   time, right?

16   A.  About an hour and a half.

17   Q.  The cars that pulled up, would those have been Mankato

18   cars or FBI government cars?

19   A.  FBI vehicles.

20   Q.  Okay.  Are those marked vehicles?

21   A.  No.

22   Q.  And what were you wearing as you conducted the interview

23   of Mr. Jensen, other than your sidearm and your pistol?

24   What was your outfit?

25   A.  I would have been dressed casually; pair of pants,

1    probably a button-down shirt of some sort.

2    Q.  Did you have your badge around your neck?

3    A.  No.  I would have been wearing body armor upon initial

4    entry with FBI displayed on it.

5    Q.  Body armor like a bulletproof vest, right?

6    A.  Correct.

7    Q.  The rest of your team had body armor as well, right?

8    A.  They would have had similar markings on it, yes.

9    Q.  But they all had bulletproof vests on?

10   A.  Yes.

11           MR. MICKO:  I have no further questions, Your

12   Honor.

13           THE COURT:  Thank you.

14           Ms. Kayser.

15

16                    **REDIRECT EXAMINATION**

17   **BY MS. KAYSER:**

18   Q.  You indicated that you were wearing body armor; is that

19   correct?

20   A.  That's correct.

21   Q.  You also indicated that your colleagues were wearing

22   body armor; is that correct?

23   A.  Yes.

24   Q.  Do you know as you sit here today whether they were

25   wearing that body armor outside their clothes or under their

```
 1    clothes?
 2    A.  It may have been a combination of both.  Some people
 3    have a soft vest they will wear under their clothes with an
 4    extra carrier, and others have one unit and once the scene
 5    is secured they will take it off.
 6    Q.  Why do you wear body armor?
 7    A.  For personal protection.  In case somebody wants to
 8    shoot us we won't get killed.
 9              MS. KAYSER:  Thank you.  I have no further
10    questions.
11              THE COURT:  Anything further?
12              MR. MICKO:  No, Your Honor.
13              THE COURT:  Agent, you may be excused.  Thank you.
14              THE WITNESS:  Thank you.
15              MS. KAYSER:  Your Honor, the government calls
16    Detective Tom Rother to the stand.
17              THE COURT:  All right.  Detective, if you would
18    raise your right hand.
19              (Witness administered oath by the Court.)
20              THE COURT:  Thank you.  Be seated.  State your
21    full name and spell your last name for the reporter.
22              THE WITNESS:  Tom Rother, R-O-T-H-E-R.
23
24    **TOM ROTHER**
25                        **DIRECT EXAMINATION**
```

1    **BY MS. KAYSER:**

2    Q.  How are you employed, sir?

3    A.  Through the City of Mankato.

4    Q.  What do you do for the City of Mankato?

5    A.  I'm a detective.

6    Q.  How long have you been a detective?

7    A.  I have been a detective for five years.

8    Q.  Can you give us an overview of your career in law

9    enforcement.

10   A.  Sure.  I was hired with the City of Mankato in 2006, was

11   a patrol officer for almost two years, and then was assigned

12   to the school as a school resource officer at the various

13   high schools in Mankato for about six years.  Then I went

14   into full-time investigations.

15   Q.  Do you have a specific area of focus as a detective?

16   A.  Yes.  Most of my caseload involves criminal sexual

17   conduct, both adult and juvenile.

18   Q.  You investigate those cases?

19   A.  Yes.

20   Q.  Did you arrest Timothy Joseph Jensen on August 10th,

21   2018?

22   A.  Yes.

23   Q.  What did you arrest him for?

24   A.  Probable cause for second-degree criminal sexual

25   conduct.

1    Q.  Can you explain the nature of those charges?

2    A.  Sure.  The nature of the charges were a report came to

3    us about sexual contact with a five-year-old victim, and

4    through the investigation through forensic interview and

5    other witness interviews it was determined that there was

6    probable cause for Mr. Jensen's arrest.

7    Q.  Now, where did you arrest him?

8    A.  At his residence.

9    Q.  Is that located in Mankato?

10   A.  Yes.

11   Q.  Is that the same residence that Agent Moule was talking

12   about?

13   A.  Yes.

14   Q.  And you live in Mankato; is that correct?

15   A.  The outskirts of Mankato, yep.

16   Q.  And so is Mr. Jensen's house in a residential area?

17   A.  Yes.

18   Q.  Are you familiar where his girlfriend lives?

19   A.  Yes.

20   Q.  And how far away is his girlfriend's house?

21   A.  Less than a mile.

22   Q.  Approximately what time did you arrive at Mr. Jensen's

23   residence to arrest him?

24   A.  About 2:00 in the afternoon.

25   Q.  And were you in marked squad cars?

1    A.  I was not.

2    Q.  Were there marked squad cars there?

3    A.  Yes.

4    Q.  What happened when you arrived at Mr. Jensen's house?

5    A.  Myself and a couple other detectives, along with at

6    least one patrol officer with the City of Mankato, went to

7    the residence and knocked on the door.

8    Q.  And did he answer the door?

9    A.  Yes.

10   Q.  Did you place him in custody?

11   A.  Yes.

12   Q.  Was he handcuffed?

13   A.  Yes.

14   Q.  What happened after you handcuffed him?

15   A.  After I handcuffed him, I escorted him to the patrol

16   vehicle, which was on the street there just at the end of

17   his driveway; let him know that we were there to search his

18   residence, and we had a search warrant in hand and that he

19   was under arrest.  He was placed in the back of the squad

20   car.

21   Q.  Did he stay at the scene?

22   A.  No.

23   Q.  Where did he go?

24   A.  He was transported to the Blue Earth County Justice

25   Center.

1    Q.   How far away is that?

2    A.   I would approximate about a mile in distance.

3    Q.   What happened at the Blue Earth County Justice Center?

4    A.   There he was -- it was like the prebooking area.  It's

5    basically -- there's two interview rooms.  There's two

6    holding cells area in that adjacent area to the booking

7    area.  And there I conducted an interview with him.

8    Q.   Was that interview recorded?

9    A.   Yes.

10   Q.   Is that both audio and visual recorded?

11   A.   Yes.

12   Q.   You have before you Government Exhibit 4.  Do you see

13   that?

14   A.   Yes.

15   Q.   What is Government Exhibit 4?

16   A.   Appears to be a disk that states "Rother interview."

17   I'm assuming that's going to be audio and video.

18   Q.   Okay.  And the audio and video recording of your

19   interview of Mr. Jensen, is there a date and timestamp on

20   that recording?

21   A.   Yes.

22   Q.   Approximately what time did your interview of Mr. Jensen

23   start?

24   A.   About 2:14 in the afternoon.

25   Q.   So you indicated that you went to arrest Mr. Jensen at

1    approximately 2:00; is that correct?

2    A.  Yes.

3    Q.  And you started the interview at approximately 2:14?

4    A.  Yes.

5    Q.  How far away is Mr. Jensen's house from the Blue Earth

6    County Justice Center?

7    A.  Maybe a mile.  If I were to guess with light traffic it

8    takes 10, 15 minutes at the most.

9    Q.  Prior to interviewing Mr. Jensen, did you read him his

10   Miranda rights?

11   A.  Yes.

12   Q.  How many times?

13   A.  Twice.

14   Q.  Okay.  Let's talk about the first time.

15   A.  Sure.

16   Q.  When was the first time that you read Mr. Jensen his

17   Miranda rights?

18   A.  When he was placed in the back of the squad car, I

19   immediately read him his Miranda warning.

20   Q.  At that time did you ask Mr. Jensen any questions?

21   A.  No.

22   Q.  So why did you read him his Miranda rights if you didn't

23   ask him any questions?

24   A.  Just because the patrol officer -- because I'm not the

25   one who transported him to the jail, in case he made some

1    incriminating remarks at that time to my interview at the

2    jail or in case that patrol officer would have asked him any

3    questions.

4    Q.  You testified you advised him of his Miranda rights

5    twice; is that correct?

6    A.  Yes.

7    Q.  When was the second time?

8    A.  The second time is at the 2:14 mark when I started my

9    interview with him at the Blue Earth County Justice Center.

10   Q.  When you advised Mr. Jensen of his Miranda rights, was

11   that recorded on Government Exhibit 4?

12   A.  Yes.

13   Q.  Now, can you describe for us the location of where you

14   interviewed Mr. Jensen.

15   A.  Sure.  So it's in a prebooking area.  It's, basically,

16   an area between where the garages at the Justice Center --

17   where prisoners are transported.  It's, basically, a

18   go-between area between the garage and where the booking

19   area is at the jail.

20   Q.  So was there a table in the room?

21   A.  Yes.

22   Q.  Were there chairs in the room?

23   A.  Yes.

24   Q.  What are you wearing in the recording?

25   A.  I'm wearing khaki pants and a polo T-shirt -- or polo

1    shirt.

2    Q.  Did you have your gun with you?

3    A.  Not in the interview because that would have been out in

4    the locker in the garage.

5    Q.  So you did not have a firearm with you?

6    A.  No.

7    Q.  What is Mr. Jensen wearing in the interview?

8    A.  He's got like a cut-off jean shirt I would call it, kind

9    of cut off at the sleeves, the sleeves cut off.  Ball cap

10   forward and jeans.

11   Q.  Is he facing the camera in the recording?

12   A.  Yes.

13   Q.  Is he handcuffed?

14   A.  Yes.

15   Q.  Why was he handcuffed?

16   A.  It's a discretionary -- on our policy they can either be

17   handcuffed or unhandcuffed depending on the situation.

18   Being it was a felony-level offense, due to officer safety,

19   I think it was appropriate to handcuff him at that point.

20   Q.  Can you tell us how you advised Mr. Jensen of his

21   rights?

22   A.  Through the Miranda warning.

23   Q.  How did you do that?

24   A.  I read the Miranda warning off my phone.  I pulled off

25   the Miranda warning and read it to him right off my phone.

1    Q.  Can you see that on Government Exhibit 4?

2    A.  Yes.

3    Q.  Did you ask Mr. Jensen if he understood his rights?

4    A.  Yes.

5    Q.  What did he tell you?

6    A.  He said he did.

7    Q.  Did you ask Mr. Jensen if he wanted to talk to you?

8    A.  Yes.

9    Q.  What did he tell you?

10   A.  He acknowledged he did.

11   Q.  At the time you spoke to Mr. Jensen, did he appear to

12   you to be under the influence of drugs or alcohol?

13   A.  No.

14   Q.  Did he appear to you to be oriented to time and place?

15   A.  Yes.

16   Q.  Did he appear to you to understand your statements and

17   questions?

18   A.  Yep.

19   Q.  Did you threaten Mr. Jensen to get him to talk to you?

20   A.  No.

21   Q.  Did you promise Mr. Jensen anything to get him to talk

22   to you?

23   A.  No.

24   Q.  During the interview, did you explain to Mr. Jensen what

25   you were investigating?

1    A.  Yes.

2    Q.  What did you tell him?

3    A.  I told him I was investigating some -- a report that

4    came across my desk involving some sexual contact with a

5    five-year-old female.

6    Q.  How would you describe Mr. Jensen's demeanor during the

7    interview?

8    A.  Relaxed and pleasant.

9    Q.  Did he laugh during the interview?

10   A.  Yes.

11   Q.  Can you hear that on the recording?

12   A.  Yes.

13   Q.  Did he, in fact, correct you during the interview?

14   A.  Yeah, there is at least one or two points there where he

15   actually corrected me when I got something wrong.  I was

16   trying to, basically, run a synopsis of what he just told

17   me.  He actually corrected me on one or two points.

18   Q.  Approximately how long did your interview of Mr. Jensen

19   last?

20   A.  About 30 minutes.

21   Q.  At the end of the interview, did you ask Mr. Jensen if

22   he spoke to you voluntarily?

23   A.  Yes.

24   Q.  What did he tell you?

25   A.  Yes.

1    Q.  At the end of the interview, did you ask him whether you

2    had promised him anything or threatened him in any way?

3    A.  I asked him that.

4    Q.  What did he tell you?

5    A.  Nope.

6                MS. KAYSER:  I have no further questions.  Thank

7    you.

8                THE WITNESS:  Thank you.

9

10                       **CROSS-EXAMINATION**

11   **BY MR. MICKO:**

12   Q.  Detective Rother, your description of your interactions

13   with Mr. Jensen, those were all recorded on Government's

14   Exhibit 4, correct?

15   A.  At the Blue Earth County Justice Center, yes.

16   Q.  Yes.  And prior to that, I think you testified that the

17   only interactions you had were to inform him that he had

18   been arrested, right?

19   A.  Yep.

20   Q.  Handcuffed him, right?

21   A.  Yep.

22   Q.  Bring him to the patrol car?

23   A.  Yes.

24   Q.  And then at the patrol car to give him his Miranda

25   warnings?

1    A.  Yes.

2    Q.  Other than that, everything has been recorded?

3    A.  Yeah.

4    Q.  At the time that you arrested Mr. Jensen, you knew he

5    had a pending federal case, right?

6    A.  Yes.

7    Q.  As a part of your investigation for your case, I assume

8    you had investigated what the federal offense was, too,

9    right?

10   A.  I knew that he had just appeared in court the day prior

11   for child pornography charges.

12   Q.  How did you know that?

13   A.  From Special Agent Moule.

14   Q.  So you and Special Agent Moule were working kind of hand

15   in glove on this investigation, too?

16   A.  No.  He just made me aware, because what happened is the

17   family told me about the charges and so with that we had a

18   conversation.  I just wanted to know what the charges were,

19   and so he kind of let me know what the charges were and that

20   he was just seen the day prior.

21   Q.  When you say you "wanted to know what the charges were,"

22   that suggests that you knew that he had actually been

23   charged, right?

24   A.  Yes.

25   Q.  He was under indictment at that time?

1    A.  Yeah.

2    Q.  Okay.  And did you look at his docket at all yourself?

3    A.  I don't believe so.  No.

4    Q.  But you knew he was charged with a federal offense,

5    right?

6    A.  Yes.

7    Q.  You've got over a decade of experience as a

8    law-enforcement officer, right?

9    A.  Yes.

10   Q.  Is it a fair assumption for you to know that if someone

11   is charged, they probably have a lawyer, too, right?

12   A.  Yes.

13   Q.  And you knew that Mr. Jensen probably had a lawyer?

14   A.  Yes.

15   Q.  I want to talk about the squad car for a minute with

16   you, the patrol car.

17   A.  Sure.  Yep.

18   Q.  Is it a Mankato police -- Mankato police have a policy

19   as far as squad car dashcam video?

20   A.  Yes.

21   Q.  What is that policy?

22   A.  We have, actually, five cameras in our squad car, and so

23   that all would've been recorded I'm assuming.

24   Q.  So when you say you have five cameras, I think I know

25   what these are.  So you have one that looks out, right --

1    the front, right?

2    A.  Yep.

3    Q.  And then often times is there one that activates on the

4    back seat when there is pressure in the back seat?

5    A.  With ours, again -- no, I don't believe so because it's

6    a plastic seating.  I think it actually has to be active by

7    either an officer or one of the triggering mechanisms within

8    the system.

9    Q.  So where are the other three angles?

10   A.  So there is one on the front.  There is one on the back

11   seat.  And there is one on each side.  So it would have been

12   side views on each side of the car.  And one on the back.

13   Q.  When you gave Mr. Jensen his Miranda warning the first

14   time, was he already in the squad car?

15   A.  I believe he was in the back seat, yeah, kind of in the

16   squad car.

17   Q.  And where were you?

18   A.  I was outside the squad car, just outside the doorway of

19   the squad.

20   Q.  And do you happen to know whether the cameras were

21   rolling at that time?

22   A.  I don't recall, no, because it was a different patrol

23   officer, so I don't know.

24   Q.  Okay.  The dash cameras that you have down in Mankato,

25   do they operate automatically by some type of triggering

1    event, such as turning on the lights?

2    A.   Yes.

3    Q.   Do you know whether the lights were on at the time?

4    A.   I don't believe so.  No.

5    Q.   But an officer can turn them on manually as well?

6    A.   Yeah, button on their lapel mic.

7    Q.   Did you have a body camera or a body recorder of any

8    kind?

9    A.   No.

10   Q.   Do you remember if Mr. Jensen said anything back to you

11   after you gave him that first set of Miranda warnings?

12   A.   I don't recall, no.

13   Q.   And then from there do you know whether he said anything

14   in the squad car on the way for his transport?

15   A.   I don't believe so.  According to the officer's report,

16   it didn't indicate anything.

17   Q.   And from that transport the next time you saw him was

18   when he was in the room, right?

19   A.   Yes.

20   Q.   And when he was in the room from -- it's shown on the

21   video, but sometimes the perspective is off.  Is it about

22   the size of the witness well there?

23   A.   Yeah.  Yep.

24   Q.   And from your orientation there if you were Mr. Jensen,

25   the door would be toward the other wall, right?

1    A.  If I was Mr. Jensen, the door would be over here

2    (indicating).  So if I'm Mr. Jensen, I'm facing towards the

3    door.

4    Q.  Okay.  And the thing that's between Mr. Jensen and the

5    door would be you, right?

6    A.  Yes.

7    Q.  And a large kind of desk, right?

8    A.  Yeah, not real large.  I would say it would take up

9    about half the -- not even -- well, half the section into

10   the room or into the space.

11   Q.  Was it just the two of you who were present for the

12   interview?

13   A.  At one point that same patrol officer that transported

14   popped in.

15   Q.  And what did he or she do?

16   A.  He said, "You're Recording," and so I acknowledged it.

17   I think the recording is working or he said something to

18   that effect.

19   Q.  Oh, is it a live recording or something like that?

20   A.  Yeah.  I think that officer actually flipped the switch

21   for me.  So I think he was just confirming that we were

22   recording so I knew that we were recording.

23   Q.  And that officer was a uniformed officer?

24   A.  Yes.

25   Q.  Fully armed; is that right?

1    A.  Yes -- well, not at that time because his gun, I'm

2    assuming, would have been in the garage.

3    Q.  Are guns not allowed in the Justice Center?

4    A.  No.  At that point it's a jail facility so you can't

5    bring your firearms in.

6    Q.  And the recording is done through -- that recording is

7    done through one camera, right?

8    A.  Yes.  I believe so.

9    Q.  One microphone?

10   A.  Yes.  Yes.

11          MR. MICKO:  I have no further questions, Your

12   Honor.

13          THE COURT:  Thank you, Mr. Micko.

14

15                  **REDIRECT EXAMINATION**

16   **BY MS. KAYSER:**

17   Q.  The uniformed officer who defense counsel asked you

18   about, did he stay for the interview?

19   A.  I don't believe so.  I think he ended up leaving.

20   Q.  So he came in at the start of the interview?

21   A.  Yes.

22   Q.  And you indicated that his gun would not have been

23   allowed there either; is that correct?

24   A.  No.  Per policy he would have had to check that in a

25   locker out in the garage area.

1           MS. KAYSER:  Thank you.  I have no further

2     questions.

3           THE COURT:  Anything further?

4           MR. MICKO:  No, Your Honor.

5           THE COURT:  All right.  Thank you.

6           You may step down.  Thank you.

7           Ms. Kayser, any further witnesses?

8           MS. KAYSER:  No, Your Honor.  The government

9     rests.

10          THE COURT:  Thank you.

11          Mr. Micko, is the defense calling any witnesses?

12          MR. MICKO:  We are not, Your Honor.

13          THE COURT:  All right.  So that matter -- well,

14    the evidentiary hearing is done.  Let's talk housekeeping on

15    the briefing.  What sort of time frame do you need,

16    Mr. Micko?

17          MR. MICKO:  Your Honor, if we can get a transcript

18    in seven days, we'd like to brief seven days after that.

19          THE COURT:  All right.  By my count then, your

20    brief would be due why don't we say December 14th.

21          And Ms. Kayser?

22          MS. KAYSER:  Your Honor, may I have two weeks?

23    I've got a little more to write than defense counsel.  I am

24    also duty the week of Christmas.

25          THE COURT:  So am I.

1          MS. KAYSER:  I will be on vacation the week of

2    December 10th, so I anticipate when I get back from

3    vacation, I'll have quite a bit on my desk.

4          THE COURT:  Well, that date would then be December

5    28th.  Is that sufficient for you?  Or would it be better to

6    give defense counsel until the 21st and then you would have

7    until January 4?  What's your preference?

8          MS. KAYSER:  January 4.  That would actually work

9    better.

10          THE COURT:  Is that okay with you, Mr. Micko?

11          MR. MICKO:  That's fine.

12          THE COURT:  So your brief then, Mr. Micko, is due

13    December 21.

14          And then, Ms. Kayser, January 4.  Okay?

15          MS. KAYSER:  Yes.

16          THE COURT:  Anything further?  Let me address

17    something then, and neither of you should read anything into

18    this.  Okay?  But I want to make sure that you address a

19    couple of things in this briefing.

20          One is -- and, again, this may say more about me

21    than anything else -- there's the question floating about of

22    the preclusive effect, I guess is one way of putting it, of

23    decisions in this district.  So I want to make sure that

24    that is covered with respect to the search warrants.

25          And then my memory of the case that Judge Noel

1    had, I don't recall that there was in that case -- I don't

2    remember if there was a state search warrant or not; and if

3    there was, I don't remember whether that was part of the

4    analysis vis-a-vis the good-faith exception.  So if that

5    plays into that analysis -- and maybe it doesn't -- I want

6    to make sure you address that as well.  Does that make

7    sense?

8              MS. KAYSER:  Yes.

9              MR. MICKO:  Yes.

10             THE COURT:  All right.  Anything further for the

11   government, Ms. Kayser?

12             MS. KAYSER:  No, Your Honor.

13             THE COURT:  All right.  Thank you.

14             Anything further for the defense?

15             MR. MICKO:  No, Your Honor.

16             THE COURT:  All right.  Thank you both.  Court is

17   in recess.

18             (Court adjourned at 2:53 p.m.)

19                         *     *     *

20             I, Debra Beauvais, certify that the foregoing is a

21   correct transcript from the record of proceedings in the

22   above-entitled matter.

23             Certified by:   *s/Debra Beauvais*
                               Debra Beauvais, RPR-CRR
24

25